IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

**OLVIN RECARTE CRUZ,**

    **Petitioner,**

    v.                                                 **CASE NO. 20-3284-JWL**

**ROBERT GUADIAN, et al.,**

    **Respondents.**

**MEMORANDUM AND ORDER**

This matter is a petition for writ of habeas corpus filed under 28 U.S.C. § 2241. Petitioner is detained at the Chase County Jail in Cottonwood Falls, Kansas ("CCJ"), under the authority of the Enforcement and Removal Office ("ERO"), Immigration and Customs Enforcement ("ICE"), a sub-agency of the U.S. Department of Homeland Security ("DHS"). Petitioner claims his detention is in violation of substantive due process under the Fifth Amendment due to the risk to his health and safety posed by COVID-19. Petitioner seeks immediate release. (ECF No. 1, at 8.)

**I. Background**

Petitioner is a native and citizen of Honduras. Declaration of Deportation Officer Kirk Ellis, ¶ 7, (ECF No. 3–1) (hereinafter "Ellis Decl."). Petitioner first encountered officers with ERO on or about January 15, 2016, at the Lee's Summit Police Department after an arrest for a traffic violation. Ellis Decl., ¶ 8. Petitioner was served with a Notice to Appear by ERO, which alleged he was inadmissible into the United States pursuant to 8 U.S.C. § 1182(a)(6)(A)(i).[1] Ellis

---

[1] Section 1182(a)(6)(A)(i) provides that "[a]n alien present in the United States without being admitted or paroled, or who arrives in the United States at any time or place other than as designated by the Attorney General, is inadmissible." 8 U.S.C. § 1182(a)(6)(A)(i).

1

Decl., ¶ 9-10.

*Removal Proceedings*

On or about January 22, 2016, the Notice to Appear ("NTA", Form I-862) was filed for Petitioner. A hearing was held on March 16, 2016, and Petitioner conceded he was inadmissible to the United States pursuant to 8 U.S.C. § 1182(a)(6)(A)(i). Ellis Decl., ¶ 9-10. Petitioner applied for cancellation of removal pursuant to 8 U.S.C. § 1229b(b)(1). Ellis Decl., ¶ 10. The Immigration Court held a hearing on April 3, 2017 to consider Petitioner's application for relief from removal. Ellis Decl., ¶ 11.

On June 8, 2018, the Immigration Judge entered a decision denying Petitioner's application for cancellation of removal and granting him voluntary departure pursuant to 8 U.S.C. § 1229c(b). Ellis Decl., ¶ 12. If Petitioner failed to comply with the conditions of the voluntary departure order, he was ordered removed to Honduras. Ellis Decl., ¶ 12. Petitioner appealed the decision to the Board of Immigration Appeals ("BIA") on or about June 29, 2018. Ellis Decl., ¶ 13.

On June 19, 2020, the BIA dismissed Petitioner's appeal. Ellis Decl., ¶ 14. The BIA did not reinstate the grant of voluntary departure because Petitioner failed to submit proof of posting the voluntary departure bond ordered by the Immigration Judge. Ellis Decl., ¶ 14. Petitioner asked the BIA to remand his proceedings to the Immigration Court for consideration of additional evidence in support of his application for cancellation of removal, but the BIA denied his motion to remand. Ellis Decl., ¶ 14.

Petitioner filed a petition for review with the Eighth Circuit Court of Appeals on July 10, 2020. Ellis Decl., ¶ 15; *see also Recarte-Cruz v. Barr,* Eighth Circuit Case No. 20-2398. The Eighth Circuit has not yet ruled on his petition. (ECF No. 1, at 2).

On November 10, 2020, ERO officers arrested Petitioner to execute the Immigration

Judge's removal order.  Ellis Decl., ¶ 16.  A travel document was issued by the Honduran Consulate on November 20, 2020.  Ellis Decl., ¶ 17.  ERO plans to remove Petitioner to Honduras on the next available ICE Air Operations flight to Honduras.  Ellis Decl., ¶ 21.

*Petitioner's Medical Status and ERO actions*

On October 27, 2020, ICE ERO released COVID-19 Pandemic Response Requirements ("PRR"), Version 5.0.  Ellis Decl., ¶ 18.  The PRR sets forth specific mandatory requirements expected to be adopted by all detention facilities housing ICE detainees, as well as best practices for such facilities, to ensure detainees are appropriately housed and that available mitigation measures are implemented.  Ellis Decl., ¶ 18.  The PRR delineates the following populations that are potentially at higher risk from COVID-19:  (1) older adults (55 plus); (2) people who are pregnant; (3) people of all ages having chronic health conditions including cancer; chronic kidney disease; COPD; immunocompromised state from organ transplant, obesity (body mass index of 30 or higher); serious heart conditions, such as heart failure, coronary artery disease, or cardiomyopathies; sickle cell disease; Type 2 diabetes mellitus; asthma (moderate to severe); cerebrovascular disease; cystic fibrosis; hypertension or high blood pressure; immunocompromised state from blood or bone marrow transplant, immune deficiencies, HIV, use of corticosteroids, or use of other immune weakening medicines; neurologic conditions, such as dementia; liver disease; pulmonary fibrosis; smoking (current and former); thalassemia; Type 1 diabetes mellitus; (4) people of all ages who are detained with a physical or mental impairment that substantially limits one or more major life activity or who has a record of physical or mental impairment that substantially limits a major life activity; (5) severe psychiatric illness.  Ellis Decl., ¶ 20.

When Petitioner was booked into the Chase County Jail on November 10, 2020, his intake

assessment indicated he did not suffer from any medical conditions implicated by ERO's current PRR.  Ellis Decl., ¶ 21.

ERO is aware of the decision in *Fraihat et. al. v. U.S. Immigration and Customs Enforcement, et al.,* 445 F. Supp. 3d 709 (C.D. Cal. 2020) ("*Fraihat*").  Ellis Decl., ¶ 22.  ICE has taken steps to review cases that fall within that class action and continues to do so.  Ellis Decl., ¶ 22.  According to ICE records, Petitioner does not have any medical or psychiatric diagnosis that implicates the class or subclass defined in *Fraihat*.  Ellis Decl., ¶ 23.

*Conditions at the CCJ*

The CCJ has an Intergovernmental Services Agreement ("IGSA") with ICE ERO and has housed immigration detainees since 2008.  Declaration of Chase County Jail Administrator Larry Sigler, ¶ 9, (ECF No. 3–2) (hereinafter "Sigler Decl.").  The CCJ is a detention facility located in Chase County, Kansas, capable of housing 140 inmates.  Sigler Decl., ¶ 8.  As of November 19, 2020, the CCJ houses 70 inmates, which represents approximately 50% of the CCJ's capacity.  Sigler Decl., ¶ 8.  The number of inmates housed at the CCJ has been reduced since April 15, 2020, in an effort to limit inmate population due to the COVID-19 pandemic, and it is not anticipated that the inmate population will increase significantly in the foreseeable future.  Sigler Decl., ¶ 8.  The CCJ has reduced the number of other counties from which it accepts inmates and now only accepts inmates from Morris County, Kansas, in addition to those inmates from Chase County.  Sigler Decl., ¶ 11.  Of the 70 inmates currently housed at the CCJ, 65 are immigration detainees and 5 are county inmates.  Sigler Decl., ¶ 10.

As of November 16, 2020, the State of Kansas has reported 122,741 cases of COVID-19 in the state, resulting in 1,266 deaths.[2]  Sigler Decl., ¶ 4.  As of that date, Chase County has seen

---

[2] The website for the Kansas Department of Health and Environment shows the following state totals as of November 27, 2020:  1537,021 cases; 5,018 hospitalizations; 1,529 statewide deaths; and 659,403 negative tests.  The website

4

134 positive cases of COVID-19 within the county, which equates to a case rate of 50.60 cases per 1,000 people, or 5.060%. Sigler Decl., ¶ 6. Respondents asserted there was only one active case of COVID-19 at the CCJ as of November 16, 2020, relying on information from the Chase County Health Department. Sigler Decl., ¶ 7. However, as Petitioner pointed out in his Traverse, data maintained by ICE and available online indicates that as of November 26, 2020, the CCJ had 15 confirmed cases of COVID-19 currently under isolation or monitoring, no detainee deaths, and 79 total confirmed cases since testing began in February 2020. *See* https://www.ice.gov/coronavirus (last visited November 30, 2020).

The CCJ has implemented numerous and substantial precautions to protect inmates from the COVID-19 pandemic. Staff members are directed to wear N95 masks and eye protection whenever they are in contact with inmates or other staff members. Sigler Decl., ¶ 17. Inmates have been provided with cloth masks and are directed to wear them when they interact with other people and whenever they cannot maintain at least 6 feet of distance from another person. Sigler Decl., ¶ 17. Quarantined inmates are required to eat in their cells rather than in the open areas of the pod. Sigler Decl., ¶ 17.

Beginning March 20, 2020, the CCJ adapted its procedures to limit the risk of COVID-19 exposure to inmates. Sigler Decl., ¶ 19. The CCJ has been closed to the public and all inmate visitation privileges have been suspended since March 19, 2020. Sigler Decl., ¶ 21. All inmate court appearances occur remotely via video from within a courtroom located in the CCJ, in an effort to limit contact between inmates and people outside of the facility, and the courtroom is cleaned and sanitized between each person. Sigler Decl., ¶¶ 18, 21. The only people who enter the CCJ, other than CCJ staff members, are ICE agents bringing in detainees or emergency

---

reflects 160 total cases in Chase County as of that date. See https://www.coronavirus.kdheks.gov/160/COVID-19-in-Kansas (last visited November 30, 2020).

maintenance workers, if necessary. Sigler Decl., ¶ 22. The ICE agents and emergency workers are temperature checked upon entry to the building and are directed to wear masks at all times when in contact with inmates. Sigler Decl., ¶ 22.

The CCJ employs approximately 30 staff members, including correctional officers, medical staff, and kitchen staff. Each staff member receives a medical screening conducted by medical personnel upon arrival at the CCJ. Sigler Decl., ¶ 23. The screening includes a temperature check and questioning, consistent with CDC guidelines, to determine whether the employee displays any signs or symptoms of COVID-19. Sigler Decl., ¶ 23. If an employee has a temperature of 100º or higher or shows any other signs or symptoms of COVID-19, the employee will be sent home to quarantine and all medical staff and inmates who have been in close contact with the potentially positive employee will continue to be screened. Sigler Decl., ¶ 23. Staff members are directed to wear masks at all times when in contact with inmates regardless of the length of time of the contact and are also directed to wear masks when in confined areas with other staff members. Sigler Decl., ¶ 24. Staff members have been educated regarding the signs and symptoms of COVID-19 and the importance of disinfecting communal spaces. Sigler Decl., ¶ 24.

The CCJ is divided into one open dorm that houses up to 20 inmates, 7 pods that each house up to 16 inmates, 1 pod that houses up to 4 inmates, and 5 segregated cells that each house up to 2 inmates. Sigler Decl., ¶ 25. Petitioner is currently segregated and housed in his own individual two-man cell in B-pod. Sigler Decl., ¶ 13.

Restrooms and showers are located within the separated spaces and are not shared between inmates housed in different pods. Sigler Decl., ¶ 25. Meals are served to inmates in their dorm or pod and no communal cafeteria is used. Sigler Decl., ¶ 25. The only facilities used by inmates outside of their pods are the recreation yard and the courtroom. Sigler Decl., ¶ 26. Inmates of one

pod do not use the recreation yard or the courtroom at the same time as inmates from another pod, and the areas are disinfected before and after access by members of different pods. Sigler Decl., ¶ 26.

Beginning March 20, 2020, in response to the COVID-19 pandemic, the CCJ started a 14-day segregation procedure for new inmates. Sigler Decl., ¶ 27. When inmates arrive at the CCJ, instead of being housed with existing inmates, as was the procedure prior to the COVID-19 pandemic, the new inmate is segregated for at least 14 days. Sigler Decl., ¶ 28. If 14 days pass without the segregated inmate showing symptoms of COVID-19, the inmate then tested for COVID-19 prior to removal from segregation. Sigler Decl., ¶ 28. If a negative result is received, the inmate is placed with recovered or other negative inmates. Sigler Decl., ¶ 28. If a positive result is received, the inmate is kept in segregation for at least 10 more days. Sigler Decl., ¶ 28.

When Petitioner reaches the end of his fourteen-day initial quarantine period, he will be tested for COVID-19. Sigler Decl., ¶ 29. Once the results of the test are received, he will be released from segregation and placed in the appropriate pod. Sigler Decl., ¶ 29.

In addition to screenings for COVID-19, each new inmate receives a full physical within the 14-day segregation period. Sigler Decl., ¶ 30.

The Chase County Health Department has indicated COVID-19 tests are available and the CCJ has had no problem obtaining testing for employees and inmates. Sigler Decl., ¶ 31.

Medical staff at the CCJ consists of a registered nurse on duty from 7:00 a.m. to 3:00 p.m., Monday through Friday, and on call 24/7; a certified medical assistant on duty on the weekends; and a doctor on call daily until 10:30 p.m. Sigler Decl., ¶ 32. Medical staff visit each pod at least once a day to provide medication and care and to respond to any questions or health concerns of inmates. Sigler Decl., ¶ 33. Opportunity for open dialog with medical staff is available at these

times, and an inmate need not make a special request to discuss questions or concerns. Sigler Decl., ¶ 33. Medical care is also available to inmates upon request, and inmates are encouraged to seek medical care if they fall ill. Sigler Decl., ¶ 33.

Notices furnished by ICE and printed from the CDC website in English and Spanish were posted in each pod on March 20, 2020. Sigler Decl., ¶ 34. The notices provide recommendations to help prevent the spread of respiratory diseases like COVID-19 and guidance on how inmates can protect themselves from COVID-19. Sigler Decl., ¶ 34. These notices include information about the importance of hand washing and hand hygiene, avoiding close contact with other people, covering coughs and sneezes with a tissue instead of hands, avoiding touching the eyes, nose, and mouth, and disinfecting commonly used surfaces. Sigler Decl., ¶ 34. The notices also provide education regarding the symptoms of COVID-19 and encourage anyone showing the signs to seek medical attention. Sigler Decl., ¶ 34.

All inmates at the CCJ are provided with soap and shampoo twice weekly and encouraged to clean themselves daily. Sigler Decl., ¶ 35. Petitioner has limited access to the shower facilities in his pod, which is allowed during the one hour he is permitted out of segregation. Sigler Decl., ¶ 35. Petitioner is by himself when he uses the shower facilities. Sigler Decl., ¶ 35. In the event an inmate runs out of personal cleaning products before the next scheduled distribution, the inmate need only request additional cleaning products by filling out an Inmate Communication Request form and handing it to the correction officer on duty. Sigler Decl., ¶ 36. The CCJ will not deny a request for additional personal cleaning products, and requests are made regularly. Sigler Decl., ¶ 37.

In addition to personal cleaning products, the CCJ also provides a cleaning cart in each pod, which contains disinfectant, spray bottles, mops, rags, and paper towels for inmates to clean

their cells and other surfaces in the pod as desired. Sigler Decl., ¶ 39. If the cleaning cart runs out of supplies, an inmate need only push a button to notify the correction officer on duty and the supply will be replenished. Sigler Decl., ¶ 39. The CCJ was well-stocked in cleaning supplies prior to the COVID-19 pandemic and has not faced a shortage of cleaning supplies as a result of COVID-19. Sigler Decl., ¶ 40. Personal clothing is changed and laundered daily, uniforms are changed and laundered three times per week, and bedding is laundered once per week. Sigler Decl., ¶ 41. Personal protective equipment is provided to inmates upon arrival and when they leave or are released. Sigler Decl., ¶ 42.

Inmate Communication & Request Forms are available for inmates to communicate with corrections officers and medical staff. Sigler Decl., ¶ 43. The form directs the inmate to circle one of the following types of communication: Appeal, Request, Medical, Attorney Call, Grievance, Law Library, or Property Release, and provides places for the inmate to further describe the purpose of the request, as well as a place for the responding officer to write a response. Sigler Decl., ¶ 43. These forms can be used by inmates to request additional cleaning supplies, request medical attention or care, or convey grievances regarding the condition of the pods, inadequate supplies, or inadequate medical attention. Sigler Decl., ¶ 43.

The CCJ is familiar with all applicable COVID-19 related guidance, including the *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities,* issued by the CDC and updated on October 21, 2020, and is committed to continue the development of new and novel strategies to ensure the health and safety of all inmates at the CCJ. Sigler Decl., ¶¶ 46-47.

The CCJ also has reviewed the October 27, 2020 ICE ERO COVID-19 Pandemic Response Requirements, Version 5.0. Sigler Decl., ¶ 44. In compliance with the guidance, CCJ staff has

identified all detainees meeting the CDC's identified populations potentially being at higher risk for serious illness from COVID-19 and ensured both the ERO Field Office Director and Field Medical Coordinator have knowledge of these detainees and their medical needs. Sigler Decl., ¶ 45.

## II. Discussion

Petitioner raises one ground for relief. Petitioner argues that Respondents have violated his substantive due process rights by subjecting him to punitive conditions of confinement as a result of the excessive risk to his health and safety posed by COVID-19.

Respondents oppose the petition on two bases. First, they argue that this Court lacks jurisdiction because the federal habeas statute, 28 U.S.C. 2241, is not the appropriate vehicle for what is essentially a challenge to Petitioner's conditions of confinement. Second, Respondents argue Petitioner has not demonstrated that conditions at the CCJ pose an unreasonable risk of harm.

### A. Jurisdiction

A petition for habeas corpus relief seeks "release from unlawful physical confinement." *Preiser v. Rodriguez*, 441 U.S. 475, 485 (1973). To obtain habeas corpus relief, a petitioner must demonstrate that "[h]e is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3). Prisoners who want to challenge only the conditions of their confinement, rather than its fact or duration, are required to do so through civil rights actions filed pursuant to 42 U.S.C. 1983 or *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971). *Standifer v. Ledezma*, 653 F.3d 1276, 1280 (10th Cir. 2011).

Here, Respondents argue that Petitioner's allegations relate to the conditions of his confinement, not to the fact or duration of that confinement. Petitioner responds that the punitive conditions of detention at the CCJ pose such a serious threat to his health that he should be released.

A recent opinion from the District of New Mexico examined this issue in depth, framing the question as, "What if confinement itself is the unconstitutional 'condition of confinement'?" *Gomez-Arias v. U.S. Immigration and Customs Enforcement*, No. 20-CV-000857-MV-KK, 2020 WL 6384209, at *2 (D.N.M. Oct. 30, 2020) (quoting *Essien v. Barr*, No. 20-CV-1034-WJM, 2020 WL 1974761, at *1 (D. Colo. Apr. 24, 2020) (unpublished)). "A challenge to a dangerous prison environment may be construed as a challenge to the *conditions* of the confinement; yet because the only effective remedy to stop the spread of the virus is robust separation of individuals, and because such separation is not possible in densely populated prisons without releasing a portion of the prison population, the challenge may also be construed as an action regarding the *fact or duration* of confinement." *Id*. (citing *Wilson v. Williams*, No. 4:20-CV-00794, 2020 WL 1940882, at *5 (N.D. Ohio Apr. 22, 2020) (unpublished), *vacated on other grounds*, 961 F.3d 829 (6th Cir. 2020)).

The *Gomez-Arias* court recognized that the Tenth Circuit has not yet directly addressed a challenge like Petitioner's.  However, the court cites a comment made by the Tenth Circuit in an unpublished case that where a petitioner is "contending that in light of the pandemic he should be released from custody because there are *no conditions of confinement* that could adequately prevent an Eighth Amendment violation," then federal habeas proceedings may be appropriate. *Id.* at *3 (quoting *Medina v. Williams*, No. 20-1193, 2020 WL 4782302, at *2 (10th Cir. Aug. 18, 2020) (emphasis in original)).  In addition, the *Gomez-Arias* court collects cases from across the country that have found habeas is an appropriate avenue to bring claims that confinement is unconstitutional because of conditions caused by the COVID-19 pandemic and ultimately agrees with those cases.  *See id.*

11

The Court notes, as did the *Gomez-Arias* court, that some courts have found such claims must be brought in a civil rights action. *See, e.g., Basri v. Barr,* No. 1:20-CV-00940-DDD, 2020 WL 5036063, at *2 (D. Colo. May 11, 2020) (holding prisoner could not bring a habeas action for COVID-19 related concerns); *Aguayo v. Martinez*, Civil Action No. 1:20-cv-00825-DDD-KMT, 2020 WL 2395638, *2 (D. Colo. May 12, 2020) (finding that the court lacked jurisdiction over request for immediate release based on COVID-19 because "a conditions-of-confinement claim cannot be asserted in a petition for habeas corpus under binding Tenth Circuit precedent") (citing *Palma-Salazar v. Davis*, 677 F.3d 1031, 1035 (10th Cir. 2012)); *Archilla v. Witte*, No. 4:20-cv-00596-RDP-JHE, 2020 WL 2513648, at *19 (N.D. Ala. May 15, 2020) (noting that petitioners, who are seeking release from ICE custody due to the COVID-19 outbreak, are trying to shoehorn a conditions-of-confinement claim under section 2241). However, the Court finds persuasive the reasoning of the court in *Gomez-Arias*. Petitioner's claim is cognizable in habeas, and the Court has jurisdiction.

**B. Risk to Petitioner's Health and Safety**

Federal immigration detention is a form of civil detention and must comply with the Due Process Clause of the Fifth Amendment. *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001). The Fifth Amendment prohibits the federal government from depriving any person of life, liberty, or property without due process of law. U.S. Const. amend. V. Under the Fifth Amendment, civil detention must be "nonpunitive in purpose and effect." *Zadvydas,* 533 U.S. at 690. A detainee can prevail on a Due Process claim by showing (1) "an expressed intent to punish on the part of the detention facility officials," (2) that the conditions are "not rationally related to a legitimate nonpunitive governmental purpose," or (3) that the restriction "appears excessive in relation to that purpose." *Kingsley v. Hendrickson*, 576 U.S. 389, 398 (2015). Civil detention violates the Fifth

Amendment when the conditions of confinement amount to punishment of the detainee.  *Bell v. Wolfish*, 441 U.S. 520, 535 (1979).

In addition, the Fifth Amendment provides detainees a right to be protected from harm. "[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being."  *DeShaney v. Winnebago Cty Dep't of Soc. Servs.*, 489 U.S. 189, 199-200 (1989).  However, prison officials do not have an absolute duty to protect detainees; the standard is "reasonable safety," or reasonable measures to ensure the safety of detainees.  *Id.*; see also *Lopez v. LeMaster*, 172 F.3d 756, 759 (10th Cir. 1999).  "[T]he Constitution does not require that detention facilities reduce the risk of harm to zero."  *C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 212 (D.D.C. 2020) (quoting *Benavides v. Gartland*, Civ. A. No. 20-46, 2020WL 1914916, at *5 (S.D. Ga. Apr. 18, 2020)).

Petitioner has not alleged any official at the CJJ has expressed an intent to punish him, and he does not attempt to argue that Respondents have no legitimate governmental purpose in detaining aliens to prevent them from absconding and ensuring they appear for removal proceedings.  *See Jennings v. Rodriguez,* ___ U.S. ___, 138 S. Ct. 830, 836, 200 L.Ed.2d 122 (2018); *Demore v. Kim*, 538 U.S. 510, 523 (2003) ("[T]his Court has recognized detention during deportation proceedings as a constitutionally valid aspect of the deportation process.").  Instead, Petitioner is claiming Respondents' failure and refusal to take necessary steps to stop the spread of COVID-19 at the CJJ poses a risk to his health and safety, is tantamount to punishment, and therefore violates his right to due process.  (ECF No. 1, at 8).

Petitioner has not shown that the CCJ has failed to take reasonable steps to ensure Petitioner's health and safety in light of the COVID-19 pandemic.  Petitioner starts with the

allegation that out of 78 current detainees at the CCJ, 77 have tested positive for COVID-19. (ECF No. 1, at 1). Respondents claimed in response that the CCJ has just one current positive COVID-19 case. (ECF No. 3, at 2). Both sides appear to be wrong. As discussed above, the most recent information from ICE shows that 79 detainees at the CJJ have tested positive since February of 2020. Currently, there are 15 confirmed cases. This is vastly different than Petitioner being "the only inmate who hasn't tested positive" at the CCJ. (ECF No. 1, at 3). His allegation that "[t]here is no way . . . to social distance from everyone who is COVID-positive at Chase County" (ECF No. 1, at 5) apparently stems from the misunderstanding about the current number of infected detainees. Respondents assert that Petitioner is in a segregation cell and will remain there for 14 days in accordance with their protocols. He eats in his cell and showers alone. While Petitioner admits he is being isolated in segregation, he points out the only telephone available for him to speak with his attorney about his pending Eighth Circuit appeal is located in a common area where other inmates and jail staff are present. (ECF No. 1, at 3). Respondent does not specifically address the telephone use but does state that all inmates and staff have masks, which are worn whenever other people are present and not socially-distant. Further, the CJJ has implemented cleaning and disinfecting protocols, and inmates have access to cleaning supplies and soap for handwashing at all times.

Petitioner also complains he has not been tested for COVID-19 since his arrest and asserts all individuals should be tested before being placed at the CCJ. (ECF No. 1, at 3, 5). In his Traverse, he cites to the CDC's *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities* in support of this assertion. (ECF No. 4, at 3). Also in the Traverse, Petitioner further alleges the CCJ should be monitoring detainees'

temperatures, segregating positive detainees for 14 days rather than 10, and testing detainees before releasing or transferring them, again citing the CDC guidance.

The CDC guidance states that it provides "guiding principles" and "recommendations" and "may need to be adapted based on individual facilities' physical space, staffing, population, operations, and other resources and conditions." The Court declines to find that a failure to follow every recommendation demonstrates that a facility's response to the pandemic is unreasonable or amounts to punishment of its detainees.

Despite Petitioner's arguments, the Court finds Respondents have not violated his due process rights to be protected from harm and to be free from punishment. Although there has been an outbreak of COVID-19 and there are currently confirmed cases, the CJJ has taken objectively reasonable precautionary measures to protect Petitioner from harm. Respondents are not required to guarantee no injury or risk to Petitioner. *See Gomez-Arias*, 2020 WL 6384209, at *8 (citing *Cox v. Glanz*, 800 F.3d 1231, 1247-48 (10th Cir. 2015); *Hope v. Warden of York Cty Pris*on, 972 F.3d 310, 330 (3d Cir. 2020) (holding the task of eliminating all risk of contracting COVID-19 "is not the constitutional standard")). "While there is unfortunately still a possibility that Petitioner could be exposed to COVID-19 despite [CJJ's] precautionary measures, . . . the duty of [CJJ] officials to ensure Petitioner's safety is not absolute." *Id*. at *9.

Petitioner has not shown that his detention is unreasonable or unconstitutional. Petitioner has failed to show that "[h]e is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3).

**IT IS THEREFORE ORDERED BY THE COURT** that the petition is **denied.**

**IT IS SO ORDERED**.

**Dated November 30, 2020, in Kansas City, Kansas.**

                                                 <u>**S/  John W. Lungstrum**</u>
                                                 **JOHN W. LUNGSTRUM**
                                                 **UNITED STATES DISTRICT JUDGE**